# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| KAIJUAN JULIUS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:18-cv-00202-TWP-MPB ) |
| MARION COUNTY SHERIFF, ROBERT FLACK, Detective, | ) ) ) ) |
| Defendants. | ) |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This case is before the Court on a Motion for Summary Judgment filed by Defendants Marion County Sheriff ("the Sheriff") and Indianapolis Metropolitan Police Department ("IMPD") Detective Robert Flack ("Detective Flack"). (Filing No. 40.) Plaintiff Kaijuan Julius ("Julius") initiated this action pursuant to 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendment of the United States Constitution and Indiana state law. He seeks monetary damages against the Sheriff and Detective Flack, for injuries sustained as a result of false arrest/ imprisonment, malicious prosecution, and abuse of process and for false arrest/ imprisonment against the Sheriff for failure to release him from the jail in a timely manner. (Filing No. 1.) The Defendants move for summary judgment on all claims, asserting there are no factual disputes, they are entitled to judgment as a matter of law and entitled to qualified immunity. (Filing No. 40.) For the following reasons, Defendants' Motion for Summary Judgment is **granted** as to the claims addressed in the motion.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Julius as the non-moving

party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On September 30, 2015, at approximately 11:22 A.M., IMPD officers Cathy Faulk ("Officer Faulk") and Grace Sibley responded to a dispatch report that a person was shot at 1925 Centennial Avenue in Indianapolis, Indiana. ([Filing No. 42-1](#).) Upon arrival at that address, the officers found a victim lying on his back between the kitchen and living room. *Id.* at 1. Medics arrived on scene and after examining the victim, pronounced him dead. *Id.* Homicide officers were summoned to the scene. *Id.*

Homicide Detective Flack responded to the scene at approximately 11:50 A.M. along with Detective Tom Lehn ("Detective Lehn"). *Id.* When they arrived, the detectives spoke with the responding officers. *Id.* Officer Faulk informed Detective Lehn that as she was driving north on Centennial Avenue approaching the house, she saw a "late 1990's to early 2000's gold Pontiac Grand Prix driving in reverse south from in front of a vacant residence at 1916 N. Centennial Av. striking a mailbox … as the vehicle was leaving the scene." *Id.* Officer Faulk described the driver of the gold Pontiac as "a black male, early 20's, dark complexion, wearing a baseball cap on top of a tall afro." *Id.* She described the passenger as "a black male, early 20's, light complexion, freckles, reddish brown hair and wearing a yellow shirt." *Id.*

The victim was subsequently identified as Dennis Vaughn, Jr. ("Vaughn"). Officers took statements from Vaughn's mother, Carolyn Vaughn, and his sister, Danielle Vaughn. *Id.* Both were home at the time but neither saw the shooting. *Id.* Carolyn Vaughn reported hearing her son tell her to "call the police." *Id.* And Danielle Vaughn heard her brother say, "get out of here," followed by a gun shot. *Id.* Danielle Vaughn went upstairs to find her brother in the kitchen. *Id.*

She took him to a bedroom to get a washcloth, then they went back to the kitchen where he collapsed. *Id.* Danielle Vaughn reported to police that her brother sold marijuana. *Id.*

Detective Lehn spoke to a neighbor, Christopher Tomasik. *Id.* at 2. Mr. Tomasik stated when he arrived home, Vaughn's truck was just pulling into the driveway. *Id.* The passenger in Mr. Tomasik's vehicle saw a male exiting Vaughn's truck and nodded to him. *Id.* Mr. Tomasik said he heard what sounded like someone working the action of a pistol. *Id.* Approximately ten minutes later, Tomasik stated that he heard screaming coming from Vaughn's house. *Id.* He said he did not hear a shot. *Id.*

Detective Lehn also spoke to Vaughn's fiancé, Quinica Darden. *Id.* She reported that Vaughn was worried about being robbed and mentioned it to her two weeks prior to the shooting. *Id.*

Police obtained a search warrant for the residence at 1925 North Centennial Avenue at 1:15 P.M. that day. *Id.* They located a safe in Vaughn's bedroom, which contained three large clear plastic Ziploc bags containing suspected marijuana and two firearms. *Id.* They also found three smaller bags containing suspected marijuana in the victim's bedroom closet. *Id.* The two firearms were a Taurus .357 Magnum with a wooden handle containing six unfired rounds and a black Luger Hi Pointe 9mm semi-automatic. *Id.* On the floor of the kitchen, police found a shell casing. *Id.* It was determined to be a Luger 9mm. *Id.*

On October 1, 2015, Detective Flack attended Vaughn's autopsy conducted by Dr. John Cavanaugh. The cause of death was determined to be a gunshot wound to the neck and shoulder. The manner of death was determined to be homicide. *Id.*

That same day, Detective Flack was contacted by Vaughn's sister Danielle Vaughn. *Id.* at 3. She informed Detective Flack that Austin Ingersoll ("Ingersoll"), who had purchased marijuana

3

from Vaughn before, had called him several months ago to tell him that someone named "David" had mentioned robbing him. *Id.*

On October 3, 2015, Danielle Vaughn again called Detective Flack to tell him that Reggie Taylor ("Taylor") could be involved in her brother's murder. *Id.* Reggie Taylor is Ingersoll's stepfather. Danielle Vaughn informed officers that there was a gold car parked behind Taylor's house. Detective Flack was unable to corroborate the vehicle being present at that location but did learn that Taylor's girlfriend had a gold car. *Id.*

Also on October 3, 2015, Detective Flack interviewed Ingersoll. *Id.* Ingersoll stated that he had known David Young ("Young") for four to five years, and that Young was trying to rob everyone because he needed money. *Id.* When Ingersoll mentioned buying marijuana from Vaughn, Young asked if he could rob Vaughn. Ingersoll said no. Taylor also inquired about robbing Vaughn, and Ingersoll again said no because Vaughn was "like his family." *Id.* Ingersoll then positively identified Young and Taylor from two separate photo arrays. *Id.*

Detective Flack took a statement from Young on October 4, 2015. *Id.* Young admitted knowing Vaughn and purchasing marijuana from him but stated he had not had contact with him in several months. Young denied killing Vaughn. *Id.* He stated that he had heard that a short man with dreadlocks killed Vaughn during an argument. *Id.* Young stated that he had heard several month ago that someone wanted to rob Vaughn and opined that he was killed in a drug-related homicide. *Id.*

The case came to a standstill for eight and a half months during which no new information was uncovered. On June 29, 2016, Quinica Darden contacted the Homicide Office and reported that a man named Deshawn Gaines ("Gaines") said a person named "T.J." took responsibility for the crime in front of Gaines. *Id.* at 4. Gaines stated that T.J. had the first name "Kewan." *Id.*

4

Detective Flack took a statement from Gaines the same day. *Id.* Gaines told Detective Flack that two weeks after the murder, he was at Eric Freeman's house when T.J./Kewan pulled up and they all sat in Eric Freeman's car to "smoke". *Id.*; [Filing No. 42-3 at 2](). Gaines said that T.J./Kewan told them he pulled a "kick door," a euphemism for a home invasion. ([Filing No. 42-1 at 4](); [Filing No. 42-3 at 2]().) T.J./Kewan told Gaines that he was under the impression the victim would not be at home, but to his surprise, the victim was at home. ([Filing No. 42-1 at 4](); [Filing No. 42-3 at 3]().) T.J./Kewan then told Gaines that "they" got into a fight and "we" shot him. ([Filing No. 42-1 at 4](); [Filing No. 42-3 at 3]().) Gaines said that T.J./Kewan worked at Subway but lost his job last year. ([Filing No. 42-1 at 4](); [Filing No. 42-3 at 5]().) He described T.J./Kewan as a 22-year old, short, black male, with light skin, short wave in his hair, hazel eyes, and a mustache. ([Filing No. 42-1 at 4](); [Filing No. 42-3 at 6-7]().) Deshawn Gaines was then shown two photo arrays and identified Young in one and Taylor in the other. ([Filing No. 42-1 at 4]().)

After speaking to Gaines, Detective Flack went to the Subway restaurant at 16th Street and Centennial Avenue in an attempt to identify T.J./Kewan. *Id.* The manager was unable to help identify T.J./Kewan, but he thought the owner, who was out of town at the time, might be able to assist. *Id.* Several days later, Detective Flack spoke to the owner, Jeb Barden, who identified T.J./Kewan as the Defendant, Kaijuan Ramone Julius ("Julius"). *Id.*

Detective Flack then put together a photo array that included Julius' photograph and showed it to Gaines. *Id.* Gaines positively identified Julius as the person who told him that "they" pulled a kick door and the "we" shot him. *Id.* He also showed Ingersoll a photo array that included Julius' picture, and Ingersoll pointed out Julius as someone he "has seen in the neighborhood before," but could not identify him by name. *Id.*; [Filing No. 44-1 at 10]().

5

While researching Julius, Detective Flack learned that he had been arrested on October 10, 2015 (just ten days after Vaughn's murder) for carrying a handgun without a license. He was in possession of a Hi-Point 9mm handgun. Julius was charged with Carrying a Handgun without a License, Class A Misdemeanor, under cause number 49G10-1510-CM-035990. ([Filing No. 42-1 at 4-5](); [Filing No. 42-8]().) He pled guilty and was sentenced on January 12, 2016 to 365 days executed with 357 days suspended and 357 days probation. ([Filing No. 42-9 at 3-4]().) The firearm was placed in the property room under case number DP15117821. ([Filing No. 42-1 at 5]().) When the gun was examined it was found to be inoperable. *Id.*; [Filing No. 42-10]().

On July 6, 2016, the Hi-Point firearm was retrieved from the property room. ([Filing No. 42-1 at 5]().) Examination of the firearm revealed that the firing pin was placed in backwards and the firing pin spring was bent. ([Filing No. 42-10 at 1]().) IMPD modified the firearm to make it operable so that it could run ballistics tests. *Id.*; [Filing No. 42-1 at 5](). IMPD compared the casing found at the scene of the murder to the Hi-Point taken off Julius on October 10, 2015 and found that casing was fired from the same gun. ([Filing No. 42-10 at 1]().) The bullet recovered from the scene of the murder could not be confirmed or eliminated as having been fired by the Hi-Point pistol seized from Julius. *Id.* at 2.

After receiving the results of the ballistics tests, Detective Flack presented his Probable Cause Affidavit and charges were filed against Julius. ([Filing No. 42-6 at 2]().) Julius was charged with murder under Ind. Code § 35-42-1-1(1) and Carrying a Handgun Without a License under Ind. Code § 35-47-2-1, before judge Mark Rothenberg. ([Filing No. 42-7]().) Following his arrest on the murder charge, a Notice of Violation of Probation was filed alleging Julius had violated the conditions of probation in his handgun case. The probation violation was transferred to Judge Rothenberg's court to track the murder case. ([Filing No. 42-9 at 6]().) A hearing on a probation

violation allegation against Julius was continued over the next several months as the probation violation tracked the major felony case. *Id.*

The murder case was scheduled for jury trial beginning on Monday, May 8, 2017. ([Filing No. 42-6](#).) On May 5, 2017, the Friday before his scheduled trial to begin, the prosecutor filed a motion to dismiss the major felony charges against Julius. That motion was granted, and Judge Rothenberg ordered Julius released as to that case only. *Id.* at 8. Julius continued to be held in jail on his probation violation, and an order of release for that case was not signed until May 11, 2017. ([Filing No. 42-9 at 7](#).) He was released from the Marion County Jail on May 12, 2017.

On January 25, 2018, Julius filed the instant action against Detective Flack and the Marion County Sheriff. He brings federal claims of False or Misleading Statements in Probable Cause Affidavit, False Arrest, False Imprisonment, Malicious Prosecution, and Abuse of Process in violation of 42 U.S.C. § 1983 against Detective Flack. Julius also brings claims for Abuse of Process and Intentional Infliction of Emotional Distress in violation of Indiana state law against Detective Flack. *Id.* Against the Sheriff, Julius' brings federal claims for False Arrest and False Imprisonment as well as a state law claim for Intentional Infliction of Emotional Distress. *Id.* On April 2, 2019, the Defendants filed their Motion for Summary Judgment. ([Filing No. 40](#).)

## II. LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v.*

*Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts do not preclude summary judgment. *Id.* A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

### III. DISCUSSION

Julius brings the following claims against Detective Flack, Count I: §1983-False/ Misleading Statements in Probable Cause Affidavit; Count II: §1983-False Arrest; Count IV: False Imprisonment; Count VI: §1983-Malicious Prosecution; Count VII: Malicious Prosecution; Count VIII: §1983-Abuse of Process; Count X: Intentional Infliction of Emotional Distress. The claims against the Sheriff are Count III; §1983-False Arrest; Count V: False Imprisonment; and Count X: Intentional Infliction of Emotional Distress. In support of their summary judgment

motion, Defendants' assert: (1) the claims based on false or misleading statements in the probable cause affidavit fail as a matter of law because there was probable cause for Julius's arrest; (2) Julius' malicious prosecution claims fail as a matter of law because probable cause existed and there is no evidence of malicious intent; (3) there is no evidence that Detective Flack knowingly made false statements that were material to the finding of probable cause; (4) Detective Flack is entitled to qualified immunity; and (5) Julius was held pursuant to a valid court order until his release. ([Filing No. 41](#).) The Court will first address Defendants' qualified immunity argument, then move to the merits.

### A. **Qualified Immunity**

As an initial matter, the Court notes that in their Motion for Summary Judgment, Defendants assert "Defendants are entitled to qualified immunity from Plaintiff's suit." ([Filing No. 40](#).) However, in their accompanying brief Defendants assert only that "Detective Flack is entitled to qualified immunity." ([Filing No. 41 at 19-20](#).)

Qualified immunity protects government officials from liability "when they act in a manner that they reasonably believe to be lawful." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Put another way, government officials performing discretionary functions are entitled to qualified immunity if their conduct could reasonably have been thought consistent with the rights they are alleged to have violated. *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006) (citing *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006)). Qualified immunity not only protects a defendant from liability, but also from the burden of standing trial. *Id.* As such, "courts should determine as early on in the proceedings as possible whether a defendant is entitled to qualified immunity." *Id.* When presented with a qualified immunity defense, the Court must first "(1) determine whether the plaintiff has alleged the deprivation of an actual constitutional

9

right and, (2) if so, determine whether that right was clearly established at the time of the alleged violation." *Sparing v. Vill. of Olympia Fields*, 266 F.3d 685, 688 (7th Cir. 2001) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Although qualified immunity is an affirmative defense, the burden of defeating an assertion of qualified immunity rests with the plaintiff. *Id.* (citing *Spiegel v. Cortese*, 196 F.3d 727 (7th Cir. 1999)). Accordingly, Julius bears the burden of showing that the constitutional right allegedly violated was clearly established before Detective Flack acted by offering either a closely analogous case or evidence that Detective Flack's conduct so patently violated the constitutional right that reasonable officials would know so without guidance from courts. *Gossmeyer v. McDonald*, 128 F.3d 481, 496 (7th Cir. 1997) (citing *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993)).

The "clearly established" standard requires the contours of the right to be sufficiently clear such that a reasonable official would understand that what he is doing violates that right. *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999); *Doe v. Bobbitt*, 881 F.2d 510, 511 (7th Cir. 1989). In ascertaining whether a particular right has been "clearly established," the Seventh Circuit looks either to binding precedent from the U.S. Supreme Court or this Circuit or, in the absence of controlling authority on point, such a clear trend in the case law that the recognition of the right by a controlling precedent was merely a question of time. *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

Defendants argue that Detective Flack is entitled to qualified immunity because "[t]here is no evidence that [he] knowingly made false or misleading statements or omit[ted] exculpatory evidence in his probable cause affidavit that were material to the finding of probable cause." ([Filing No. 41 at 20](Filing No. 41 at 20).) Citing *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 714 (7th Cir. 2013), Defendants' assert that any mistakes Detective Flack made in writing his probable cause affidavit

10

were reasonable, and thus he is entitled to qualified immunity under the "arguable probable cause" doctrine. (Filing No. 41 at 20.)

In contrast, Julius alleges numerous false statements, misrepresentations and omissions of fact in the probable cause affidavit submitted by Detective Flack. He contends "Ingersoll <u>never said</u> the subject in photo number three used to hang out with David Young and, in fact, Austin Ingersoll could not identify the subject in photo number three by name. [Filing No. 44-1 p. 10]." (Filing No. 45 at 2.) (Emphasis in original.) He alleges Detective Flack is misleading in his probable cause affidavit as to his investigation into the alleged "gold car" and its occupants; Detective Flack failed to include that Deshawn Gaines and TJ/Kewan were both intoxicated and smoking marijuana when the alleged admission was made; and Detective Flack "cherrypicked the information from the July 12, 2016, Laboratory Exam Report without including all information." (Filing No. 45 at 2-4.) Finally, Julius argues Detective Flack obtained the firearm from the evidence locker without a warrant in contradiction to the Fourth Amendment of the United States Constitution, and had it tested but failed to include this "important fact in the probable cause affidavit. *Id*. at 4.

A "warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (citations omitted). The Seventh Circuit has determined the right to be free from an illegal arrest based on false or misleading statements in a probable cause affidavit is clearly established. "In 1992, in *Juriss v. McGowan*, we stripped an officer of qualified immunity where only his false and misleading statements provided probable

11

cause to arrest a woman aiding a fugitive." *Betker v. Gomez*, 692 F.3d 854, 864 (7th Cir. 2012) (citing *Juriss v. McGowan*, 957 F.2d 345, 349-50 (7th Cir. 1992)).

At this stage of the proceedings, the Court accepts the facts in favor of Julius, the non-moving party. Julius has presented sufficient facts to show that Detective Flack recklessly included false or misleading statements material to the finding of probable cause. The right to be free from arrest based on false statements in a probable cause affidavit is a constitutional right and that right was clearly established at the time of Detective Flack's alleged violation. Accordingly, the Court concludes that Detective Flack is not entitled to qualified immunity and the Court will proceed with analysis on the merits.

**B.      Probable Cause**

Julius federal claims fail for the reasons explained below. Defendants seek summary judgment on Julius' claims for False or Misleading Statements in the Probable Cause Affidavit, False Arrest, False Imprisonment, Malicious Prosecution, and Abuse of Process, arguing probable cause existed for Julius' arrest. (Filing No. 41 at 10.) Defendants assert that any false or misleading statements Detective Flack made are immaterial and probable cause still existed to arrest Julius.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997)). "Police officers have probable cause to arrest when the totality of the facts and circumstances within their knowledge at the time of the arrest would warrant a reasonable person in believing the person has committed a crime." *Hart*, 798 F.3d at 587 (citing *Sangamon Cnty.* at 714). As the Court said above, to violate the Fourth Amendment, a false statement on a probable cause affidavit must have been made knowingly, intentionally, or with reckless disregard for the

truth. "A reckless disregard for the truth can be shown by demonstrating that the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Id.* (internal quotations and citations omitted). "The materiality of an omitted … fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause." *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010). If the omitted fact would not have negated probable cause, its omission was immaterial and there was no Fourth Amendment violation.

Here, there were multiple facts that could have led a reasonable person to believe Julius was involved in Vaughn's murder. First, and most importantly, a shell casing found at the scene of the murder was identified by ballistics tests as "having been fired by" the Hi-Point 9mm Luger Julius was carrying when he was arrested on October 10, 2015. ([Filing No. 42-10](#).) Second, Gaines gave Detective Flack information that connected Julius to the murder. He said that T.J./Kewan admitted to the home invasion and the murder, that T.J./Kewan was friendly with Young and Taylor, and that T.J./Kewan drove "a goldish Alero kind of car." ([Filing No. 42-3 at 8](#).) Although Gaines was unable to identify T.J./Kewan as Kaijuan Julius, he reported that T.J./Kewan had worked at Subway and Detective Flack verified with the manager that Julius had worked at Subway. ([Filing No. 42-1 at 4](#).) In addition, Ingersoll identified Julius from a photo lineup as someone he recognized from the neighborhood. ([Filing No. 44-1 at 10](#).) Importantly, ten days after the murder Julius was arrested with a handgun that left a shell casing at the scene, and that handgun was determined to be the murder weapon. These facts establish probable cause for Julius' arrest.

13

Count VIII alleges abuse of process against Detective Flack in violation of § 1983. The tort of abuse of process is governed by Indiana law, which requires: 1) ulterior motive, and 2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Estate of Mayer v. Lax, Inc.,* 998 N.E.2d 238, 256 (Ind. Ct. App. 2013). Thus, the starting point of inquiry is not motive or intent, but whether a party used an improper process to accomplish a goal other than that which the law was designed to accomplish. *Id*. Neither party addressed the purported federal claim of abuse of process—other than Defendants' assertion that the claim fails as a matter of law because there was probable cause for Julius' arrest. The Court agrees that the federal claim fails as a matter of law, however, it fails because there is no federal claim for abuse of process under § 1983. Construing all facts in the light most favorable to Julius, a reasonable fact-finder could not find that Detective Flack's alleged conduct gives rise to any Fourth or Fourteenth Amendment violation for abuse of process.

Probable cause is a complete defense to wrongful arrest and malicious prosecution claims brought under § 1983, and there is no actionable § 1983 claim for abuse of process; accordingly, the Court **grants** Defendants' Motion for Summary Judgment as to these federal claims.[1]

## C.     False Statement in Probable Cause Affidavit

Julius alleges one misstatement in the probable cause affidavit. The affidavit states that in his interview with Detective Flack on July 4, 2016, "Austin Ingersoll … said that David Young used to hang out with the subject in photo number three." ([Filing No. 42-1 at 4](#).) The subject the affidavit refers to there is Julius. Julius also alleges three misleading statements from the probable cause affidavit. First, the initial detective on the scene saw a gold Pontiac driving away, but Gaines

---

[1] The standard the Court applies in this section is irrelevant to Julius' False Imprisonment claims, which are made under Indiana law rather than § 1983. Defendants do not address any of Julius' state law claims.

said that T.J./Kewan drove a gold Alero[2], and police never connected Julius to a gold car beyond Gaines' statement. Second, the probable cause affidavit omitted the fact that the conversation between Gaines and T.J./Kewan occurred when both were intoxicated and smoking marijuana. And third, Julius alleges Detective Flack omitted information from the laboratory report about the firearm—he did not note in the affidavit that the bullet found at the murder scene could not be matched to the handgun seized from Julius during his arrest on October 10, 2015.

Defendants argue that these errors were not made knowingly, intentionally, or with reckless disregard for the truth, and thus cannot support a claim for false statement in the probable cause affidavit. ([Filing No. 41 at 15-16](#).) The Court agrees. Detective Flack made one misstatement in the affidavit. He stated Ingersoll connected Julius to Young and Taylor, when in fact it was Gaines who connected Julius to those two persons of interest. ([Filing No. 42-1 at 4](#); [Filing No. 42-3 at 8-9](#).) Ingersoll merely stated that Julius was someone he recognized from the neighborhood. ([Filing No. 44-1 at 10](#).) No evidence in the record indicates that this was anything more than an unintentional inaccuracy. This statement is immaterial and its omission would not have changed the magistrate judge's determination that probable cause existed for Julius' arrest. Detective Flack attributed the connection among Julius, Young, and Taylor to the wrong source, but he did not invent the connection.

As for the three misleading statements or omissions Julius points out, no evidence in the record indicates they were material to the affidavit. In other words, if Detective Flack had included the full context of for those statements, as Julius argues he should have, it would not have negated probable cause. The distinction between the gold Pontiac an officer reported seeing fleeing the murder scene and the gold Alero Gaines connected to Julius is insubstantial. More important to

---

[2] An Alero is a model of Oldsmobile, not Pontiac.

the affidavit was the ballistics report, which showed that a shell casing found at the scene was produced by the handgun Julius was arrested with ten days later. Julius argues Detective Flack should have included in his affidavit the fact that the ballistics test could not match the bullet to that firearm, but that fact does not negate the report on the shell casing, which puts Julius' handgun at the scene of the crime. Even if Detective Flack had noted the inconclusive test on the bullet, probable cause still existed for Julius' arrest because his handgun was placed at the scene. The ballistics test did not rule out Julius' handgun as the source of the bullet; it was inconclusive. Moreover, the fact that Gaines and T.J./Kewan were intoxicated when T.J./Kewan admitted to being involved in the murder would not negate probable cause. Detective Flack was able to independently verify some of the information he learned from Gaines, and Gaines' statement is unrelated to the ballistics test that placed Julius' gun at the crime scene.

There is no evidence that any misstatement Detective Flack made in the probable cause affidavit was knowing, intentional, or made with reckless disregard for the truth. Any omissions or misleading statements in the affidavit were immaterial, as they would not have negated probable cause. Accordingly, the Court **grants** Defendants' Motion for Summary Judgment as to Julius' federal claim of False/Misleading Statements in the Probable Cause Affidavit.

**D.     Claims Against the Sheriff**

In Count III, Julius alleges "Defendant Marion County Sheriff's actions constitute a false arrest in violation of the Fourth and Fourteenth Amendment of the United States Constitution which is actionable under 42 U.S.C. § 1983." (Filing No. 1 at 6 ¶ 53.) In Count V, he alleges "Defendant Marion County Sheriff's actions constitute false imprisonment in violation of Indiana state law." *Id*. at 7 ¶ 55. In his Complaint, Julius asserts that he seeks monetary damages against

16

the Sheriff for false arrest/imprisonment for failure to release him after ordered to do so in a timely manner. *Id*. at 1. However, Julius has designated no evidence whatsoever to support these claims.

The designated evidence shows that Julius was at all times held pursuant to valid court orders. The prosecuting attorney on the murder case filed a Motion to Dismiss on Friday May 5, 2017. An Order granting that motion and an Order to Release From Custody (as to this case only) was signed by Judge Rothenberg on May 5, 2017; however, the orders were not docketed until Monday, May 8, 2017. ([Filing No. 42-6 at 8](#).) The probation violation matter remained pending. On May 11, 2017, Judge Rothenberg signed an Order to Release from Custody (as to this case only) on the probation revocation petition. ([Filing No. 42-9 at 7](#).) The Sheriff obeyed that order and Julius admits in his Complaint that he was released from the Marion County Jail the next day, May 12, 2017. ([Filing No. 1 at 5](#) ¶ 41.) These material facts are not in dispute and Julius has not even addressed these claims in his response. Accordingly, the Court **grants** the Motion for Summary Judgment as to Counts III and Count V.

### E. Remaining Claims

The Court has granted Defendants' Motion for Summary Judgment as to Count I (False/Misleading Statements in Probable Cause Affidavit), Counts II and III (False Arrest), Count VI (Malicious Prosecution), and Count VIII (Abuse of Process), all of which were brought under § 1983. In addition, the Court has granted summary judgment for Count V (False Imprisonment under Indiana law). That leaves the following state law claims: Count VII (Malicious Prosecution under Indiana law), Count IX (Abuse of Process under Indiana law), and Count X (Intentional Infliction of Emotional Distress under Indiana law). Defendants' has not moved for summary judgment on these Counts. Accordingly, Defendants' state law claims remain pending.

## F. Supplemental Jurisdiction

For the reasons explained above, the federal claims alleged in this action are dismissed, but some state law claims remain pending. The Seventh Circuit has stated that "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Al's Serv. Ctr. v. BP Prods. N. Am., Inc.,* 599 F.3d 720, 727 (7th Cir. 2010) (citing 28 U.S.C. § 1367(c)(3)). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)) (internal quotation marks omitted).

Substantial judicial resources have not been expended on these claims and it is not clear how the pendent claims will be decided. The pendent state law claims should be decided in state court because the outcome will be based on the interpretation of a state law. *See Northwest Towing & Recovery v. State*, 919 N.E. 2d 601 (Ind. Ct. Appeals 2010). The statute of limitations on these claims tolled on the date that they were filed in this Court, so the statute of limitations will not be a barrier if Julius decides to pursue them in state court. The Court will not exercise supplemental jurisdiction over the state law claims and they are **dismissed without prejudice**.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED in part**. The Motion is **GRANTED** as to Counts I, II, III, IV, V, VI, and VIII of the Complaint, and those counts are **DISMISSED**. Defendants did not move for summary judgment as to the

18

state law claims in Counts VII, IX, and X of the Complaint.  The Court declines to exercise supplemental jurisdiction over these claims and those counts are **DISMISSED without prejudice.**

    **SO ORDERED.**

Date: 3/16/2020

*[Signature: Tanya Walton Pratt]*

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jason P. Wischmeyer
WISCHMEYER LAW OFFICE
jason@wischmeyerlaw.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ard@rucklaw.com

Tara Lynn Gerber
CITY OF INDIANAPOLIS
OFFICE OF CORPORATION COUNSEL
tara.gerber@indy.gov

Anne Celeste Harrigan
CITY OF INDIANAPOLIS
OFFICE OF CORPORATION COUNSEL
anne.harrigan@indy.gov

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
jfk@rucklaw.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ejm@rucklaw.com